24-1800 StandWithUs Center for Legal Justice et al. v. Massachusetts Institute of Technology At this time, would counsel for the appellants please introduce themselves on the record to begin? May it please the Court, Glenn Dannis from Clarkson Law Firm for Appellants. Are you going to reserve any time? I'd like to reserve three minutes, please. Okay, you may, and please proceed. May it please the Court, the District Court here erred in dismissing the Title VI and Section 1986 claims. If the Court were to affirm here, it would be to allow sustained harassment and threats, protected students being barred from certain areas of campus and from campus activities, and from school DEI offices telling students who are protected that they are not in fact protected. It would be to allow all of this to go forward. This would be bad for all minorities and would significantly undermine and weaken Title VI's protections. Judge Stearns here made an improper fact finding that MIT's escalating response, quote-unquote, was sufficient. But, of course, this was not appropriate on a motion to dismiss on a pleadings challenge. Under this Court's different precedent under Porto and Grace, where a school either doesn't act or it acts, but it learns that its initial responses were ineffective, there is a duty in order to avoid Title VI liability to act anew. Could you hone in on what it is we're talking about? Are you maintaining that the government, through its laws, can compel MIT to suppress speech that would be constitutionally protected otherwise? No, that's not our position, Your Honor. Okay, so if we start out with that, then I'm looking at the April 24 statement by the president of MIT, in which there's the allegation, the statement, that so far the demonstrations have been peaceful up until April 24. Is there any allegation of any violent event that would rebut that summary by the president, that the president knew of? Well, Your Honor, I think that as we explain in our briefing and in the complaint, there was a continuum of activity here that went over the course of many months. On November 2nd, for instance, there was essentially a breaking into and assault on a building for the Israel and MIT offices, where different professors and different grad students said that they felt threatened, that their doorknobs were shaken, and they essentially felt trapped in their offices. On November 9th, the school, President Kornbluth said, point blank, that she feared for violence due to the out-of-control and completely unauthorized events or protests that were taking place in Lobby 7. So this was on a continuum of activities. So you cited two instances where you say there was some non-peaceful activity and the president knew of it. That's correct. I mean, those are not the only two. Are there any others? Yes, there was a February 12th Lobby 7 demonstration where different demonstrators were calling for intifada. Calling for intifada is a call to violence. There were also speakers who were brought to the campus, such as Mikko Pelled, who exhorted the attendees at one of his lectures to chant from the river to the sea and, in fact, told the attendees to go confront Jews on campus at the Hillel House. So, again, there were quite a few different events. What Your Honor, I think, was referring to on April 22nd was just the last iteration of what was covered in the complaint, which was the Kresge Lawn Encampment. The Kresge Lawn Encampment, even if viewed as a sort of separate event, was one that, by its very nature, could be viewed as being violent to the extent that it was directed at and set up directly across from Hillel House. This was an encampment that was completely unauthorized, that was set up directly outside of the Jewish Center for Life on campus and was done with the intention to and had the effect of preventing those people inside Hillel from having their Seder there and from being able to celebrate an event on Kresge Lawn for which they had obtained a permit. Let me ask you, Counselor. Let's assume all the November, February events, leave those apart. Would you say that, based on that April 22nd, 23rd, forward, what happened, there's a genuine issue of material fact as to the school taking sufficient steps to remedy the environment? Absolutely, Your Honor. If you look just at the Kresge Lawn events, even there, there is absolutely, there are numerous issues of fact. For instance, the fact that on April 22nd, the day after it was set up, a graduate student wrote directly to President Kornbluth and to Chancellor Noble, begging for help, saying, We feel threatened. What can you do? Please help us. Please don't let us think that we're on our own here. And the only response from the university was to say, Don't do anything on your own. Please don't counter protest. This is simply an unreasonable response. It is unreasonable to not let this be. Let me ask this. If there were to be discovery, if we were to remand the case, through a discovery, it would be possible to see any further actions the school may have taken, which obviously you're, you know, you have what you have for purposes of pleading, but there may be other actions that could favor the school, maybe the school did many other things, but there could be other actions that favor your client. So am I correct this, you know, I'm not saying I'm correct, but would you agree that this creates an issue of material fact? Absolutely, Your Honor. I mean, if you read, you know, the 60-page order from the district court that just came out recently in Gartenberg v. Cooper Union, there are numerous places where the court says, It may turn out that the school acted reasonably. It may turn out that there are different facts that haven't been adduced here because we're simply on a pleadings challenge that show that there was nothing unreasonable about the way that the school responded. But reasonableness isn't the test. Well, being not unreasonable is the test. I thought it was deliberate indifference. Well, deliberate indifference and then comma, it says, such that the response was not unreasonable. Well, no, it uses the word clearly. Clearly unreasonable. Clearly unreasonable. There's a difference. Reasonableness is the negligence standard. Correct. It is not a negligence standard. Your pleading has to show deliberate indifference, which has been defined as being clearly unreasonable, not just that a jury could find it unreasonable. Correct. Clearly unreasonable. Here, clearly unreasonable is shown by a number of different things. Number one, we have alleged facts that the very office that's in charge of student life for diversity issues, the IHDR, told Jewish students that they were not protected. That is a critical fact, and that was one that was not cited by the district court. There are instances, numerous instances, that bear on whether something was clearly unreasonable of a school allowing its own policies to be violated. President Kornbluth said in no uncertain terms that just the Kresge Lawn encampment, for instance, was from its inception a violation of MIT's own policies. President Kornbluth said the same thing about the November 9th protest. That would suggest that let's assume you've got a demonstration that it has speech, which some students find to be offensive, but it's constitutionally protected speech, if we're at a state institution, and the school doesn't enforce its rules on where protests have to be. Are you saying that, therefore, makes our Title VI or Title IX case? So if Your Honor is asking about – I'm sorry, I may not understand. Well, 90 percent of the complaint recites speech by the protesters and then says that made the plaintiffs feel uncomfortable or threatened. Well, that's a lot different than saying – that's why I was asking earlier if there was violence that caused someone to feel threatened. Sure. Speech often makes people feel uncomfortable. Absolutely, Your Honor. I would ask Your Honor to take a look at what I thought was a very thorough First Amendment analysis in the Gartenberg case. Threats, for instance, threats like calling for intifada is not covered by 1A, nor are vandalism or things that violate time, place, and manner restrictions. The court there said that there is a clear difference for First Amendment purposes between that sort of speech, which is clearly aimed at public issues of public importance and meant to create discourse, et cetera, versus threats or speech that is clearly directed at harassing and threatening. So are you saying calling for any acts of violence is something that a university must stamp out? Yes. So if a group of students on the evening of October 7 had said Israel should attack Gaza, would that be speech that should be squashed? I think that the school would have been perfectly allowed to do that. But should the government compel the school to disallow any students from advocating that Israel should have counterattacked? If there were students who were calling for Israel to wipe out Gaza before the attack and MIT allowed that to go on, I think there would be a very sound case for the students who were opposing that speech to say this is something that violates our Title VI rights. It's harassing and threatening to be calling for people to be wiped out. So if students had advocated a decade or two ago that the U.S. should attack Afghanistan or Iraq, should the school squelch that speech, or would the government force the school to squelch it? Well, I think that there is, and again, this is something that should not be decided necessarily on a pleadings challenge, but I think that there is a significant difference between calling for the annihilation of a people and calling for – Well, to be clear, no one called for annihilation of a people in the quotes you've given us. They have called for intifada, and you are interpreting that to mean more something in particular. Yes, that's quite right, Your Honor. To Jews or Israelis, they understand intifada not to simply – and again, this is what the district court said in Gartenberg. There may be acts or phrases on their face that appear to be neutral or not have a particular meaning, but to the targeted group, they have a very specific meaning. The Seventh Circuit said the same thing about a noose in the context of statements made to African Americans, that a noose has very particular connotations that are understood very well by that group. The same can be said here for calls for intifada to Israelis. It refers to the first and second intifada from the end of the 1990s and beginning of the 2000s. Counsel, one more question. What's the closest or most similar case for any district court or any circuit that you would have, I assume, based on, you know, from maybe another campus, similar instance that has denied motion to dismiss, gone on towards summary judgment? Do you have any that you would say, this is my case? Sure. Well, I mean, for facts that are very similar here, Cooper Union, the Berkeley decision that I just submitted to Your Honors via 28-J letter a couple of days ago, and the UCLA decision where Judge Scarcey granted a preliminary injunction on similar facts, and also where the Department of Justice just weighed in with a statement of interest saying that a Title VI claim had certainly been made out. Regarding other sorts of cases, I think this nestles well under Grace or Zeno, which are cases that we talked about at great length in our briefing, and I'd be happy to discuss further. Could I just follow up on that? The Gartenberger, the Cooper Union case, it seems like the facts there were significantly more extreme than the facts here. And I'm wondering if you could analogize, if I understand it, students were forced to barricade themselves in a locked room. They were trying to call for police. They were, you know, crying for help. And I just don't, didn't see anything analogous to that in the facts of this case. And if I could just add to that, if we were to agree with your position, the district court really didn't make a finding on that question, did he? The district court. The severe and pervasive nature of the harassment. No, no. He just went right to deliberate indifference. The district court's decision was solely on deliberate indifference, and really the analysis was quite terse. But to your Honor's first point about the Cooper Union case, there are differences with respect to severity and time. The time period over which the complaint dealt with was much shorter, but the events in certain instances were more severe. There was a particular instance where students were for 30 minutes barricaded into the library, and the school said to the students, we can get you out through the back or through an escort or something, and the students refused, saying that we should not have to hide or go out the back door so that the protesting students sort of win or so that they're the ones who are in control here. In our situation, we have not a particular barricading situation, but we do have allegations that Plaintiff Buchan was not allowed through Lobby 7, which is a main corridor on the campus, because she is known to be Jewish. That is one of our allegations. We also have allegations in the complaint that, again, in the November 2nd instance, that different grad students were trapped in their offices by CAA protesters who were rattling doorknobs and shouting in the hallways, and they felt like they could not get out. So what I would say is it's not identical. I don't think any case is going to be identical, but there are quite a few similarities, and, again, in our case, this was something that was sustained over many months. What you described as similarities characterizes student uprising and protests on campuses that are hardly unique to this, whether you go to the Civil Rights Movement, the Vietnam War, shootings of youth by police, et cetera, we can think, and all of them generally are designed so they do violate some college rules or regulations. That's part of the point of getting the attention. And so you're proposing that we say that the law imposes a particular manner of dealing with those uprisings. Then I'm not sure what law applies. They tried doing some things here. They weren't totally indifferent, questioned whether it was clearly unreasonable, but they're sitting there looking at not wanting to end up like Kent State by going to the other end of the spectrum. So how are they, if we have this standard that sounds more like reasonableness, how are colleges to judge whether they're going too far or too short? Well, I would say, first of all, I'd like to remind the Court that I'm not suggesting that we move the standard at all. I'm not suggesting that it be reasonableness. I'm suggesting that we keep and I'm acknowledging that it's not clearly unreasonable. But part of not clearly unreasonable, for instance, would be evenhandedness, would be enforcing its rules in the same way for all groups. So, for instance, just like Your Honor mentioned, there are and have been protests by many different groups. If MIT responded to all of those groups in the same way, I think that they are to a great extent protected from any sort of Title VI liability. However, they have not. We included in our complaint allegations regarding the fact that, for instance, right after the George Floyd murder, there was correct and very clear statements from the university standing shoulder to shoulder with its students that it felt were most impacted by that. The school also took care to explain to the university by training what dead naming was because it's something that's very important and for certain of its students, it may seem to be facially neutral, but the school wanted folks to understand where this particular group was coming from and why that was so harmful. The school did nothing similar to that after October 7th, even when begged to do so by its students. Let me ask you a follow-up question on this. I want to give you just a proposal and see if you agree with it. It seems to me that this clearly unreasonable, deliberate, indifferent standard is analogous to the qualified immunity standard in the 1983 cases. And the whole idea of that is to only allow those cases to come to court that rise to a certain level of outrage, maybe outrageousness is too high, but of unreasonableness so that the court is not in the business of second-guessing and trying to figure out whether someone could have done a better job in hindsight. We stay out of all that and we only get involved in those cases that go far beyond that. Do you agree that this is like qualified immunity? I believe that there are similarities and I think that I know that a couple of the courts have even, I believe the Ninth Circuit in Montero and some other cases have analogized the two. So I believe that that's right. This is not like the case. I believe one of the district court cases that my friend on the other side cited, a California Northern District case where there was a single incident or one particular thing. This is something that should not be weeded out in a filter. This is months and months of students feeling unsafe to go to on-campus lectures, feeling unsafe to use certain areas of campus, being unable to use their own property. If this is not a Title VI case, it seems very difficult to see on the pleadings. It seems very difficult to see what would be a viable Title VI case. Thanks. Okay. Thank you. Thank you, counsel. At this time, would counsel for the appellee please introduce himself on the record to begin? Thank you, Your Honors. Ishan Baba on behalf of the Massachusetts Institute of Technology. As the district court correctly held, plaintiffs have failed to plausibly allege that MIT's response to the campus unrest occasioned by the tragic events of October 7, 2023, was so clearly unreasonable so as to state a claim under Title VI. As Gebser noted, deliberate indifference is an official decision by a recipient, funding recipient, not to remedy a violation or, as this court noted in ML, a response that is so lax, so poorly executed and misdirected. This reason for the high standard, of course, is that the normal means through which Title VI is enforced is through the regulatory and administrative process, the Department of Education's Office of Civil Rights. What we have here is the rare case the Supreme Court has recognized for a private right of action for individual plaintiffs seeking money damages. And that is a rare case where the Supreme Court has made clear repeatedly that there is an extremely high standard before an institution like MIT has to pay money to plaintiffs as a result of Title VI. It is not a standard of vicarious liability. It is not a standard of negligence. It requires truly an unreasonable, clearly unreasonable institutional response. Now what I'd like to do, if I can, although perhaps it's a little out of order, is to begin by talking about the response and then I can move to the predicate question of whether or not plaintiffs have alleged severe, pervasive, and unreasonable harassment such as to state a claim in the first place, objectively offensive to state a claim in the first place. So I think this court's case law gives good examples of the kind of institutional responses that have been deemed clearly unreasonable so as to satisfy a pleadings challenge. Judge Keada, you obviously are very familiar with the Doe versus Pawtucket case from the First Circuit, a 13-year-old assaulted in physical education and subsequently raped two times. You have the Canty case that my brother cites where a school continues to employ a coach who raped a student and continued the harassment after being disciplined. Or the Metro Government of Nashville case where the only response to claims of sexual harassment is this claim that a student should be homeschooled. Looking at the allegations in the complaint, and here we are limiting ourselves just to things that were quoted, cited, or linked as the District Court in footnote 6 cautioned, you see what is a fulsome response by the Institute to a constantly evolving set of circumstances. For example, October 23rd, the President addresses an anticipated classroom walkout with specific instructions in anticipation of the Lobby 7 protests, a community-wide statement outlining accelerated action on reports of harassment, use of interdisciplinary enforcement, and enhanced campus security measures. November 9th, during the Lobby 7 protest itself, a warning that protesters have to leave, discipline for those who do not through the Institute of Discrimination and Harassment Response Office, and discipline being imposed. Then you go to November 14th, and this is the other side of the coin. Rather than disciplinary measures, supportive measures for students, the Standing Together Against Hate initiative, safety steps on December 14th, interim suspension of the Coalition Against Apartheid organization that my brother mentioned because of a rally held in violation of the rules, ending of funding for that organization, prohibition of that organization using campus space. And then we get to the Kresge encampment. There, April 27th, a statement from the President that MIT police are going to be on patrol 24 hours a day and notes that discipline will occur for students who fail to vacate the encampment. May 6th, the requirement that students leave by 2.30 or they will face discipline. And finally, May 10th, the clearing of the encampment and the arrest of 10 students. How do you propose we articulate the standard here? We have deliberate indifference, and then we have clearly unreasonable, and we have the suggestion that the two may be the same, but they sound different to me. How do you propose we reconcile that? So I think ultimately, Your Honor, the sort of Title VI standard we're looking for is that the institute intentionally discriminated against students, and then the courts have sort of flowed from that a variety of different standards. I think that the correct way to interpret it is what the court said in Gebza and an official decision by the recipient not to remedy the violation. And then in applying that, what I think courts look at, including this court in Amal, is an abject institutional failure, clearly unreasonable under the known circumstances. I think that is the standard, and the reason for it is, I would say, at least twofold. I mean, number one, particularly in this context, as you mentioned, Your Honor, there are First Amendment, clear First Amendment priorities that the institute and all institutions have to build into their response, recognizing the rights of students to protest. So that's one thing. I think the second thing is a deference courts have shown to institutional responses, recognizing that when an institution like MIT balances these various different campus priorities, of course, of safety for students, prohibiting discrimination, but also the free expression rights and the creation of a campus environment, it is the rare case when, again, a court will allow a claim to go forward for money damages. And that's what we have here. The individual plaintiffs are not making sort of generalized complaints about the campus environment that could be dealt with in an administrative proceeding. They want MIT to pay money damages to them, and that is why the standard is so high. And, Your Honor, if I could, therefore, I would just say, and I think it's really probative, that Your Honor's question is about what went on on campus. Does it meet the very high standard? In some respects, that goes to the second question, which is, is there in this case. Let me just ask you before you go to the third question, counsel. You listed before Judge Gallardo's question all the affirmative actions that MIT had taken throughout all this period. Is that sufficient to allow the granting of a 12B6 motion? Or, as I have asked the plaintiffs' counsel, wouldn't some discovery be necessary? Because, again, these are just facts per se. So, Your Honor, let me answer that in two ways. These are facts as alleged just by the plaintiffs or the appellants here. So, on the very face of the complaint, they allege what the district court found in evolving and progressively punitive response. And I think the best answer to your question, Your Honor, is to answer the question you asked my brother, which is, well, what about the other cases? So, if we look at the cases that plaintiffs cite, I think they tell a dramatically different story of the allegations. And that's why I think this is the correct case to be dismissed. So, to set the context, in the 435 paragraphs of my brother's complaint, as best we could find, there was only one allegation of physical contact. It is not against any of the named plaintiffs. It's not even against somebody alleged to be a member of the organizational plaintiff who we don't think has standing. It's in paragraph 176 where an unnamed student recording a protest on her phone is alleged to have been shot. There is no allegation of physical violence against any of the plaintiffs. Let's go to the cases. But there's other forms of violence. Let me analogize it to domestic violence disputes. There's physical violence, but there can also be other types of harassment that have been proven over the years that's equally as bad. Absolutely, Your Honor. But what I think is critical here is that the standard requires severe, pervasive, and objectively offensive. And so, if we look very specifically, and I will go to the other cases in a minute, but to answer your question, if we look very specifically, what are the actual individual plaintiffs who want money damages from MIT alleged? So Plaintiff Buchan alleges she heard anti-Semitic chants and rhetoric during the protest and that she was not allowed into the Cresfield Lawn protest area, which my brother claims was an unlawful protest in the first place. Those are her allegations. What about Plaintiff Myers? The only allegation she has is involving an unknown individual with absolutely no allegation that individual was even associated with MIT, raising his front bike tire and uttering an offensive comment to her. I'm not going to say that that was not perhaps upsetting to Plaintiff Myers. I understand it could well have been. But that is very, very different from what courts have found to be severe, pervasive, and objectively offensive. And we would have to limit ourselves to those allegations, just for those two plaintiffs, correct? So those two plaintiffs, those are the allegations, Your Honor. And I think it really speaks to the fact that this is not a Title VI claim for money damages. And if you look at the kind of cases, whether it is sexual misconduct cases, obviously these kind of issues frequently arise in the Title IX context. You see the kind of horrific facts of sustained sexual abuse by people in positions of authority or schools and the notice being provided to those schools. That is not what we have here. And if we look at the cases that my brother cited, I mean, if you look at, for example, the Berkeley case, just some of the allegations here. Jewish student draped in an Israeli flag was attacked by two protesters who struck him in the head with a metal water bottle. A Jewish graduate student was the victim of a home break-in. A mob smashed through glass windows, forcing their way into an event and physically assaulting Jewish students. For example, my brother also cited the UCLA case. In the UCLA case, plaintiffs claimed that a, quote, Jew exclusion zone was set up on campus. And instead of intervening, UCLA ordered campus police to stand down and hired security staff they instructed to block the area. My brother mentioned the Cooper Union case, which was, of course, dismissed in part precisely on the First Amendment grounds that the court has brought up. But even in that case, there is an allegation in the Cooper Union case, Your Honor, that the president allegedly told the police not to intervene and that she escaped out the back of an exit. That is totally different than MIT's response, which from the very beginning, President Corn Bluth made clear the extent to which the Institute abhorred anti-Semitism. It had no place on the campus. And for that reason, the Institute engaged in this progressively increasing response. So I think the message as we read it from the case, Your Honor, is that in order to plead for money damages, in the rare case where the Supreme Court has recognized a private right of action under Title VI, it is a very high standard. And that is different from looking at a campus environment in an administrative or regulatory proceeding, which is, of course, the normal avenue through which Title VI is enforced in this country. To the sex discrimination cases that gave rise to the hostile environment claim, do they map on fully to these sort of circumstances where a given individual is not making a claim per se? Well, Your Honor, I think they do because I think that the standard for deliberate indifference requires, in order to get, again, money damages, it requires the objectively offensive, severe, and pervasive action. It requires notice being provided to the institution such that the institution can remedy that. And then, of course, it requires a clearly unreasonable response. So I think to the extent that the cases don't map on, it's because this kind of a Title VI claim, which is based on a wide array of different claimed actions with no specific claims, with some very limited exceptions of notice being given to the institution, isn't the kind of claim that is recognized under the case law that can proceed, even past a motion to dismiss, for money damages against the institute. So I do think that those cases are actually quite on point. Your Honors, you did not ask, I should pause and see if there is anything else the Court wants to discuss on Title VI before I move forward. So what you're suggesting is there may be negligence, there may be, but these are state actions, not Title VI, so if they have any remedy and they, without saying they're right or wrong, it would be a state cause of action, and unless there's diversity, it would have to go directly to state court, right? I think that's right, Your Honor. I mean, for the reasons that we said, the district court didn't address it. For the reasons that we said in our brief, we don't think that they've pled negligence or breach of contract, which are the two state law claims that they tried to bring, because I think courts are understandably and correctly hesitant to impose upon universities in loco parentis liability, and frankly, I think that the response from the university was anything but negligent, but I agree, Your Honor, I think that the Title VI standard here, which is a really high one. But the negligence is, you know, you prove negligence by preponderance, and it's easier to plead. Correct, and that is, you know, I think that is what the courts have recognized, that the Title VI for money damages claim is a very high standard, and it's one that is not met here. The other thing I would address, Your Honor, just briefly is, you know, I think that the 1985 and 1986 claim is one, again, that plaintiffs failed to state. Ultimately, I think what plaintiffs want to plead is the Title VI claim. We believe, for the reasons the district court said, they cannot do it, and then they try and essentially plead the same actions in two different vehicles, the Ku Klux Klan Act claim and the state law claims, and we think both fail. As to 1985 and 1986, Your Honors, I won't belabor the point, but I think it is very notable that to our knowledge, and my brother doesn't cite any case to the contrary, this would be the first time ever a private plaintiff, a private party, not alleged to have been involved in the underlying conspiracy was held liable for a violation of 1986. And I think there are just multiple reasons why plaintiffs have failed or appellants have failed to make that allegation. Of course, first and foremost, there is no plausible allegations of the conspiracy aimed at depriving students of their civil rights. Beyond that, there's no discriminatory animus alleged. And even besides all of that, we don't believe that appellants have properly alleged an underlying claim. I won't go into the full description we have in our briefs about why these claims need to be limited to statutory as opposed to constitutional claims, and plaintiffs certainly have not alleged anything similar to what courts in other cases have found to meet the constitutional bar. But even for their state law claims as well, excuse me, their statutory claims as well, plaintiffs have not alleged actions that are anywhere close to what a 1981 or 1982 claim is. The last thing I will just say, Your Honors, is that as we raised in our brief and it's a jurisdictional issue, we think the organizational plaintiff lacks standing here. I think that the National Association of Government Employees case from this court gives a really good taxonomy of situations in which you can have associational standing and cases that you don't. On the one hand, you have cases like Playboy, which is the preemption of an obscenity statute. May I just finish this point? Please finish. Preemption in an obscenity statute context. You have the Boston Parents Coalition case, which is a district-wide entrance exam. Those are cases where individualized plaintiff's facts are not relevant. But on the completely other side of the coin, you have cases like the National Association of Government Employees case, where there's a discrimination claim for individual job applicants. That is exactly analogous to what we have here, which is a claim that individuals were subject to severe, pervasive, objectively offensive behavior. They allegedly put the institute on notice. The institute's response was clearly unreasonable. Those kind of facts require individual plaintiffs, and for that reason, we disagree with the district court's feeling that while damages were not appropriate for the organizational plaintiff, injunctive relief could be. If there are no further questions, Your Honors, we ask that the district court's decision be affirmed. Thank you. Thank you. Three minutes rebuttal. Please identify yourself for the record. May it please the Court, Glenn Danis for plaintiff appellants. I'd just like to address my brother on the other side's comments in a couple of points. Number one, some of the points that were raised that we just heard are exactly the reasons why there needs to be a remand and there needs to be some sort of discovery. What type of discipline was meted out is one of the questions that is left quite open. But discipline was meted out. Well, our response to that is that there was a provisional suspension of one organization, after which that organization continued to act just as it had before and even said we're going to continue acting as we just had before. So query under its own rules what a provisional suspension means. That would be one of the fact issues that we would seek to figure out. I thought they suspended a number of protesters from certain extracurricular activities. Well, so there were two different discipline issues that are fact issues. One of them was about one of the organizations that was provisionally suspended. There was a separate issue that on November 9th the school said that it was suspending from non-academic activities some subset of students. How many? How many of them? What role did they play in the November 9th protest? Did that ever turn into an academic suspension? How long did it last for? We have no idea about any of these questions, the obvious point of which being was it meaningful? Was this intended to actually remedy and stop folks from acting? Did they continue to act in the same way right afterwards just as the organization did? These are fact questions that we would want to know. Under this court's more recent decision, as Judge Helpe knows in grace, we had a situation where there were some suspensions of some of the harassers and there was a mischaracterization by the school of the conduct. We have some of the exact same stuff here. We have IDHR mischaracterizing and telling students who are protected that they are in fact unprotected, and we have some subset of people getting some sort of suspension that we have no idea how meaningful it is, although we do know that it didn't seem to do much. I would also say that in response to my brother's comment about damages, that the damages here are for the loss of education. It need not be for personal injuries. Regarding Your Honor's question about whether it maps onto some of the sexual misconduct cases, here the damage is the fact that for very expensive education the plaintiffs were not entitled and were not receiving the benefits of that education for some period of time that can be quantified, that has a dollar value attached to it. I would also mention that the Berkeley decision said absolutely, if I could just finish this, Your Honors, the Berkeley decision said absolutely nothing about violence. That was not in the decision to deny the motion to dismiss on the Title VI case. It was solely because the student plaintiffs were part of a group that they alleged were treated differently. And then just my very last point on associational standing, MIT failed to file a cross appeal on that issue, and therefore their arguments regarding associational standing are not proper before this Court. That's a jurisdictional issue, isn't it? Yes, Your Honor. We could raise that to respond to. That is true, Your Honor. Okay. Thank you, Counsel. Thank you, Counsel. That concludes argument in this case.